UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    Criminal No. 00-50054

          Plaintiff,                    Hon. Bernard A. Friedman
                                        United States District Judge

JAMES D. LEWIS,

          Defendant.
_____

### United States of America's Response Opposing the Defendant's Motion for Compassionate Release
_____

Beginning in 1996 continuing until his arrest on August 15, 2000, Lewis and others brought large amounts of powder cocaine from California to Flint, Michigan, cooking up large amounts of the cocaine to convert it into cocaine base. (PSR ¶ 13). During the course of the investigation, law enforcement recovered over 300 grams of cocaine base and determined that Lewis was a leader of the organization and directed numerous others to distribute cocaine and cocaine base, including a minor. (PSR ¶¶ 12-17).

A grand jury indicted Lewis in a first superseding indictment for conspiracy to distribute cocaine, possession with intent to distribute

1

cocaine, and felon in possession of a firearm. At trial, a jury convicted Lewis of all three charges. The PSR determined that Lewis was eligible for numerous enhancements. (PSR ¶¶ 24, 25, 27, 28).

The Court sentenced Lewis to a life sentence on the first two counts and ten years imprisonment on the final count. That sentence was later reduced to 360 months imprisonment for the drug counts.

Lewis was detained during the pendency of his case and began serving his current sentence on November 13, 2001. Lewis initially moved for compassionate release, but had not exhausted his administrative remedies. He has now renewed his motion after properly doing so, and his attorney has submitted a supplemental brief on his behalf.

Although Lewis's heightened risk from Covid-19 based on his morbid obesity normally qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Lewis has already contracted and recovered from Covid-19. The risk of serious illness from reinfection is speculative and does not support an extraordinary and compelling reason for his release. Moreover, Lewis is not otherwise eligible for release. Lewis's offense and criminal history

2

make him a danger to the community, which precludes release under USSG § 1B1.13(2). His offense conduct, firearm possession, violent juvenile history, and inability to conform himself to the rules of the prison make him a danger to the community. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because of the serious nature of the offense and Lewis's lengthy remaining sentence.

The Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of August 31, 2020, this process has already resulted in at least 7,559 inmates being placed on home confinement. *See* BOP Covid-19 Website. Given these efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at *11—the Court should deny Lewis's motion for compassionate release.

## Background

Lewis's first interaction with the criminal justice system was an extraordinarily serious one, occurring when Lewis was only 14 years

old. (PSR ¶¶ 36-37). Lewis and other co-actors attempted to rob a drug house, and one of the other participants of the robbery shot and killed a woman and a child. (PSR ¶ 37). Lewis agreed to testify against the co-participants and eventually received probation in probate court on a robbery charge. *Id.* This offense, which involved the loss of life of a woman and a child, provided Lewis with an opportunity to have a serious interaction with the criminal justice system but emerge with no adult criminal record. Lewis, however, did not learn from this experience.

Instead, while on probation for that juvenile offense, police arrested Lewis possessing cocaine, resulting in another juvenile delinquency. (PSR ¶ 38). In 1994, Lewis received his first adult criminal conviction at the age of 17 for possessing marijuana. (PSR ¶ 40). At age 22, police arrested Lewis after he ran from a traffic stop. (PSR ¶¶ 49-50). In Lewis's jacket pocket was a loaded, stolen firearm. *Id.* Lewis received probation for that offense, but tested positive for cocaine while on probation. (PSR ¶ 51). Lewis began his probationary sentence in February 2000, just over six months before his arrest on this case.

A federal investigation determined that Lewis was a leader of a lengthy drug conspiracy that spanned over years. This drug conspiracy was significant, involving over 1.5 kilograms of cocaine base trafficked to Flint over the four year time period. (PSR ¶ 13). During the course of the investigation, law enforcement recovered cocaine base and powder cocaine. (PSR ¶¶ 12-17).

A grand jury indicted Lewis in a first superseding indictment for conspiracy to distribute cocaine, possession with intent to distribute cocaine, and felon in possession of a firearm. At trial, a jury convicted Lewis of all three charges. The PSR determined that Lewis was involved in a conspiracy that involved at least 1.5 kilograms of cocaine base, that he was a leader or organizer of a group involving five or more individuals, and that he involved a minor in the distribution. (PSR ¶¶ 24, 27, 28). The PSR also determined that Lewis possessed a firearm in connection with the offense. (PSR ¶ 25). The Court sentenced Lewis to a life sentence on the first two counts and ten years imprisonment on the final count, a sentence that was later reduced to 360 months imprisonment for the drug counts.

5

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

A. **The Bureau of Prisons' has taken measures to limit the further spread and impact of Covid-19 in its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates

6

are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. Lompoc FCI and USP Lompoc have been especially hard-hit by Covid-19. In response, Lompoc officials have built new medical facilities to deal with COVID-19, expanded housing, and every single inmate in the low security area of the prison (where Lewis is housed) was tested for COVID-19. At this time, however, the outbreak has significantly subsided at the facility. At FCI Lompoc, where Lewis is housed, there are no active cases amongst inmates and only two staff members currently infected, which appear to be similar numbers when the government originally responded to Lewis in July 2020.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

8

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020

Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.

Over 7,559 federal inmates have been granted home confinement since

the Covid-19 pandemic began, and that number continues to grow. BOP

Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts

show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, ___

F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19

pandemic. As the Attorney General's directives have explained, the

9

Bureau of Prisons is basing its home-confinement decisions on several

factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These

criteria account for justifiable concerns about whether inmates "might

have no safe place to go upon release and [might] return to their

criminal activities," as well as "legitimate concerns about public safety."

*Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates

indiscriminately and unleash tens of thousands of convicted criminals,

en masse. *See id.* It must focus on the inmates who have the highest

risk factors for Covid-19 and are least likely to engage in new criminal

activity. This is true not just to protect the public generally, but to avoid

the risk that a released defendant will bring Covid-19 back into the jail

or prison system if he violates his terms of release or is caught

committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C.

§ 60541(g)(2).

10

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not

place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Lewis's motion for compassionate release.

Lewis's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Lewis must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a

13

medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A. Lewis is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

15

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Lewis and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

16

Lewis is 43 years old, but is morbidly obese. Lewis is six feet tall.
He claims that he weighed 384 pounds as of February 2020. Medical
records from May 3, 2020, indicate that his weight is 344 pounds. (R.
349: Motion for Compassionate Release, Pg.ID. 1186). Regardless of
whether he weighs 344 or 384 pounds, it appears that Lewis qualifies as
morbidly obese. Lewis correctly points out that he has a risk factor for
complications for COVID-19 in the form of morbid obesity. Despite his
younger age that would ordinarily make him a lower risk of
complications, his obesity does create a higher risk. Lewis's other
claimed issues are less certain as risks for serious illness from Covid-19,
but his weight would normally qualify as an extraordinary and
compelling circumstance in conjunction with the Covid-19 pandemic.

However, Lewis has already contracted and recovered from Covid-
19.   It is likely Lewis will build up antibodies to Covid-19 for at least
some period of time. It does not appear likely that individuals can
immediately catch Covid-19 again, though the period of resistance to
the virus is unknown at this time. On March 26, 2020, while appearing
on The Daily Show with Trevor Noah, Dr. Anthony Fauci, the director
of the National Institute for Allergy and Infectious Diseases, told Noah,

17

"So, it's never 100 percent, but I'd be willing to bet anything that people who recover are really protected against reinfection." Johns Hopkins University School of Public Health states that it is "expected that there will be a low possibility of reinfection, but this is not known yet for sure." "As far as I know, there are no confirmed cases of anyone getting sick, then better, then sick again with a confirmed live virus," says Lee Riley, MD, a professor and chair of the Division of Infectious Disease and Vaccinology at the UC Berkeley School of Public Health. In other words, reinfection is speculative, and the possibility of reinfection does not rise to the level of extraordinary and compelling circumstance warranting release.

Last week marked the reporting of the first confirmed case of a reinfection of Covid-19 but it only continues to reinforce that Lewis's current circumstances do not create an extraordinary and compelling reason for his release. A single asymptomatic case of reinfection has preliminarily been confirmed and there are reports of two other cases of reinfection in Europe, though data has not been provided to substantiate these other two reinfections.

18

As one author noted, "With more than 24 million SARS-CoV-2 cases worldwide, it's likely that reinfection is probably rare if it hasn't been observed until now." A prominent Yale researched tweeted about the confirmed case of reinfection and noted, "[T]his is no cause for alarm, it's a textbook example of how immunity should work." She then noted that the second reinfection was asymptomatic because of the patient's first reinfection. Another researcher has noted that "[T]he majority of patients likely have a cocktail of immune responses that activate on second exposure," said Brian Wasik, a virologist at Cornell University. "This Hong Kong patient also seems to have been asymptomatic on second infection, perhaps due to some immune response."

Courts have varied in how they assess the risk of reinfection, with some calling it speculative and refusing to find it a compelling and extraordinary circumstance. *United States v. Daugerdas*, No. 09CR581, 2020 WL 4931988, at *3 (S.D.N.Y. Aug. 18, 2020). Other courts have noted that courts generally find that the risk of reinfection does not warrant compassionate release. *United States v. Risley*, No. 1:12-CR-0363 AWI, 2020 WL 4748513, at *2 (E.D. Cal. Aug. 17, 2020). *See also*

19

*United States v. Payne*, No. CR 14-86, 2020 WL 4747709, at *2 (E.D. La. Aug. 17, 2020) *(*risk of reinfection not compelling or extraordinary) and *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) (collecting cases dismissing risk of reinfection as an extraordinary and compelling reason for release). And in *United States v. Logan*, the court denied release to a defendant who had "already contracted—and beaten—the virus." No. 1:15-CR-00027, 2020 WL 3960999, at *2 (W.D.N.C. July 13, 2020). The court explained that "[w]hile it is unclear how long Covid-19 immunity might last following infection, it is reasonable to assume that [he] is not at risk of infection for some time." *Id.* at *2 n.4; *accord United States v. Buford*, No. 05-80955, 2020 WL 4040705, at *5 (E.D. Mich. July 17, 2020). Lewis's updated medical records show no change in his condition, and any risk of serious illness from reinfection is speculative and does not create a "compelling and extraordinary reason" warranting his release.

### B. Lewis is a danger to the community and the factors set forth in 18 U.S.C. § 3553(a) do not support relief.

Even if Lewis is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not appropriate. Before ordering relief, courts must consider

20

the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). So even if the Court were to find Lewis eligible for compassionate release, the § 3553(a) factors and § 1B1.13(2) should still disqualify him.

Lewis has a juvenile adjudication for a drug robbery that resulted in the death of two other human beings. While on probation for that offense, he still possessed cocaine. As an adult, he had a firearm conviction. He twice sustained gunshot wounds, once in 1997 and again in 1999. (PSR ¶ 59).

The offense conduct here is consistent with Lewis's overall pattern of dangerous criminal behavior. Lewis's offense was not a one-time event but rather four years of sustained criminal behavior to spread cocaine base in the city of Flint. Lewis had an aggravated role in the offense as a leader, possessed a firearm in connection with the offense, and involved a minor in his offense.

Lewis has also not demonstrated a great deal of acceptance of responsibility for the offense. Lewis's sentencing was not an acknowledgement of his wrongdoing, but instead a litany of sovereign

citizen declarations rejecting the court's authority to sentence him and even his status as a defendant. (R. 128: Sentencing, Pg.ID 577-582) (Declaring himself a "third party intervenor," declaring the case a "private matter," and stating that he does not consent to any sentence from the court).

While Lewis has served approximately 235 months of this sentence, there is nothing that indicates that releasing him ten years prior to the expiration of his sentence is a sound idea. Lewis is a danger to the community and it would undermine the seriousness of his offense to release him prior to the conclusion of his sentence. Lewis is still young enough to reoffend and cause danger to the community.

Even in custody, Lewis has not followed the rules consistently. In 2019, authorities caught Lewis with a prohibited device, a cellular phone. (Exhibit 3 of original response) This violation belies the notion that Lewis will follow the rules upon release, especially as it relates to social distancing. Lewis's release will endanger others, including taxing resources of an already depleted law enforcement.

The factors under 18 U.S.C. § 3553(a), including the serious nature of the offense, Lewis's criminal history, and the need to protect

others from Lewis do not support the idea of lopping off 33% of his total sentence.

## III.   If the Court were to grant Lewis's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Lewis's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Lewis's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

Dated:  August 31, 2020          s/*Christopher W. Rawsthorne*
Christopher W. Rawsthorne
Assistant United States Attorney
600 Church Street
Flint, MI  48502
(810) 766-5177
christopher.rawsthorne@usdoj.gov

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Kimberly Stout

<u>s/Christopher W. Rawsthorne</u>
Assistant United States Attorney